### ESTATE OF WM. STOTT.

No. 2292—July 26, 1875.

ᴄᴏɴᴠɪᴄᴛ under a sentence for life imprisonment civilly dead. Wife in such case is a widow and entitled to take as legatee or devisee where her widowhood is a condition for vesting a legacy or devise.

January 24, 1876.

ɪɴᴛᴇʀᴇsᴛ.—ᴄᴏᴍᴘᴏᴜɴᴅᴇᴅ ᴡɪᴛʜ ᴀɴɴᴜᴀʟ ʀᴇsᴛs.—ᴇxᴇᴄᴜᴛᴏʀ ᴄʜᴀʀɢᴇᴀʙʟᴇ ᴡɪᴛʜ, if he mingles estate's funds with his own in his business house.

April 30, 1878.

ᴀᴛᴛᴏʀɴᴇʏ's ғᴇᴇ.—ᴡʜᴇɴ ᴅɪsᴀʟʟᴏᴡᴇᴅ.—ɪɴᴄᴜʀʀᴇᴅ ʙʏ ᴇxᴇᴄᴜᴛᴏʀ ɪɴ ʜɪs ᴏᴡɴ ʙᴇʜᴀʟғ ɪɴ ʟɪᴛɪɢᴀᴛɪɴɢ ᴀ ᴄᴏɴғʟɪᴄᴛ ᴡɪᴛʜ ᴇsᴛᴀᴛᴇ.

An executor is not allowed attorney's fees incurred by him in litigation instituted by him for the protection of his own interests when in conflict with those of the estate.

Construing sections, C. C., 2236–7; C. C. P., 1616; Penal C., 674.

*G. B. Merrill*, for executor.

*Phelan & LeBreton*, for Mrs. King.

The will of deceased contains the following provision:

"It is my will and I give and bequeath and devise to my daughter Anna, five hundred dollars only while she remains the wife of her husband; but in case she should become a widow, it is my will and I hereby devise and bequeath to her

my entire estate, real, personal, and mixed, and in case she should decease while her husband is living, it is my will, and I hereby give, devise, and bequeath my entire estate, real, personal, and mixed,    *    *    to my brothers and sisters," etc.

The daughter, Mrs. Anna King, petitions for distribution to her of the entire estate, upon the following facts:

At the time the will was made, Anna was the wife of James C. King. In 1874, King was convicted of manslaughter in the State of New York, and was sentenced to the State Prison of that State at Sing Sing for life, where he still remains under that sentence. King was, and his wife has been ever since, and still is domiciled in New York. The statute of New York contains the provision that "a person sentenced to imprisonment in a State prison for life shall thereafter be civilly dead;" and by the law of that State it is not bigamy for a woman to marry again after her husband has been sentenced to the State prison for life, nor does a pardon restore him to marital rights.

Counsel have not been able to refer to any decision directly upon facts similar to the case at bar, but some few decisions have been cited upon points having analogy, such as, that when a man becomes civilly dead, his property goes to his heirs, and a subsequent pardon does not restore it; a pardon does not revive the old rights, but gives him new ones; the sentence dissolves the marriage relation. I have, therefore, to ascertain, as nearly as I may from the will, the intention of the testator, and carry out that intention so far as the law will permit.

The testator gives to his daughter five hundred dollars only, while she remains the wife of her husband, but should she become a widow, she is to have the entire estate; and if she should decease during the life of her husband, the estate is to go to others.

Two questions present themselves, viz:

1—What is the present status of Mrs. King and of King in New York?

2—Do they respectively occupy the same status elsewhere?

First—It was evidently in the view of the testator to prevent King from having any control over or the right to inherit any of the property bequeathed, beyond the legacy of five hundred dollars.  Whether that intention was founded upon ill-will, or upon the supposition that King could provide for his own family, does not appear.  Mrs. King was to have five hundred dollars only, while she remained the wife of King; but should she become a widow, she was to have the bulk of the estate.  Evidently she is not his wife; but is she a *widow?*  Has the contingency arrived which the testator intended?  Nearly all the English lexicographers define a *widow* to be, a woman whose husband is dead.  The words from which this word is derived, are, *viduus,* bereft, deprived of; *vidua,* a woman bereft of her husband.  She certainly is not his wife; he is not her husband; she has been bereft, deprived of, her husband; he is dead to her; he is dead to the State; he has no civil rights; he can make no contracts; he cannot sue or be sued; he cannot inherit property; if he had estate, it is subject to administration; if he had children, he has lost their guardianship, and they owe no duty to him; he has no absolute privilege except the privilege, if it be one, to breathe.  It seems to me that under such circumstances, it would be doing no violence to language, and no violence to the testator's intention, to say that she is in every sense a widow.

Second—She being, then, a widow in New York, the place of domicil, is she to be regarded here as a widow?

Story in his work on the Conflict of Laws, Sec. 65, says that the personal capacity or incapacity attached to a party by the law of the place of his domicil, is deemed to exist in every other country, even in relation to transactions in any foreign country.  Thus, a minor, a married woman, a prodigal, a spendthrift, a person *non compos mentis,* or any other person, who is deemed incapable of transacting business (*sui juris*) in the place of his or her domicil, will be deemed incapable everywhere, not only as to transactions in the place of his or her domicil, but as to transactions in every other place.  A qualification to the rule is, that the incapacity

should not be inconsistent with the policy of the country where the rule is invoked.

So far from the principle that King is civilly dead being contrary to the policy of the law of this State, we have a similar statute applying to similar sentences here.

In my opinion, Mrs. King is entitled under the will to have distribution to her of the estate.

Let a decree be entered accordingly.

### January 24, 1876.

The executor has rendered an account, to which Mrs. King has filed exceptions.

After hearing the proofs of the respective parties, the Court finds the following facts:

May 12, 1868, the account of the special administrator was settled, showing a balance of cash in his hands of $9,652.78; the letters were vacated, and on the same day the executor received that amount from the special administrator. The executor also received the following amounts: Sept. 14, 1868, $1,037.14; Dec. 1, 1868, $827. He paid as follows: May 25, 1868, $6; Oct. 8, 1868, $200; Nov. 28, 1868, $324.25; April 26, 1869, $150; and charged commissions, April 26, 1869, $554.91.

May 2, 1869, he rendered an account, which contained the foregoing items, and no others, stating the balance to the credit of the estate April 26, 1869, to be $9,463.03.

Due notice of settlement of this account was given by posting under the statute, and on the 13th May, 1869, this Court made a decree settling the account. In the decree the Court found that the " account contains a just and full account of all moneys received and disbursed by said executor from the 16th day of April, 1868, to the hearing hereof," " or were received by any other person by his order or authority for his use as such executor "; and the Court decreed " that said account be and the same hereby is in all respects as the same was rendered and presented for settlement, approved, allowed, and settled."

The account contained no item for interest, and made no reference to the money having been used. At the foot of the account are the letters "E. & O. E.," which mean, in commercial parlance, errors and omissions excepted. The affidavit of the executor was attached to the account that the account was true and contained a statement of all receipts and disbursements during the period covered by it.

Dec. 7, 1875, the executor rendered the account now undergoing settlement, in which he charges himself as follows:

| | | |
|---|---|---:|
| 1869, April 26. | To bal. acct. ren'd this day,  - | $9,463.03 |
| 1872, July 17. | Am't received of Pacific Guano Co.,  -  -  -  -  -  -  -  - | 66.15 |
| 1872, Sept. 28. | Am't received of E. A. Williams for Phœnix Island, $4,200 @ 88½ %,  -  -  - | 3,717.00 |
| | | $13,246.18 |

The executor credits himself as follows:

| | | |
|---|---|---:|
| 1869, Nov. 12. | By am't paid taxes 1869–70,  - | $277.20 |
| 1870, Oct. 19. | "   "   " 1870–71,  -  - | 269.24 |
| 1871, Nov. 17. | "   "   " 1871–72,  - | 281.06 |
| 1872, Ap'l 1, | By drawing deed for Phœnix Island | 10.00 |
| "   " 9. | " acknowledging deed,  -  -  - | 5.00 |
| " Dec. 9. | " am't paid A. T. King, drft of self, | 657.50 |
| 1875, Aug. 17. | "   "   " Geo. B. Merrill, att'y, Bal. services and retainer in Sup. Ct.  -  - | 500.00 |
| 1875, Aug. 17. | By am't commissions $3,783.15 @ 7 per cent.  -  -  -  -  -  -  - | 151.33 |

and states the balance to credit of estate to be $11,094.85.

There is no item for interest, and no statement of use in the account.

During all the period covered by these accounts, and for many years prior thereto, the executor was a member of a mercantile house in this city. There have been changes in the firm name and in some of the partners, but the executor always continued a member. The transactions and business of the house have been continuous, notwithstanding the changes in the firm names and in the partners. The house had banking accounts at various banks in this city, in which ac-

counts were deposited moneys received by the house in its business, and checks were drawn upon the banks as the business of the house required.   The executor had no individual bank account, but his private funds went into the general bank accounts of the house.   All the funds of this estate were, when received by the executor, by him placed in the banks with which the house dealt, in the accounts of the house, and were in no respect kept separate or in any manner indicated in the bank accounts separately from the funds of the house, but were used by the house, through its checks, in the same manner as its own funds.   The executor kept no separate individual account; the accounts of the estate were kept in the books of the house; the moneys disbursed on account of the estate were drawn from the banks by the checks of the house.   In general, the house had to its credit in its bank accounts, more than the amount of the funds of the estate; on several occasions the balance was less than the amount of the estate funds, and on two occasions in 1874 the accounts were overdrawn, once in $26,000 and once in $4,000, but the deficiency was immediately made good. The house had occasion, from time to time, to borrow money temporarily in its business; some of the loans were made at the banks where the accounts were kept, some elsewhere. In loans of large sums, security was given; in loans of inconsiderable amounts, no security was given.   The interest paid by the house on these loans varied from nine per cent. per annum to one per cent. per month.   The house has at all times been and is a responsible house, of character and standing, able to have forthcoming the funds of the estate when required.   The executor, on being examined as a witness, claimed that the funds of the estate had not been used, except temporarily as above stated, prior to April, 1875; but he admitted that in that month the funds of the estate were used by the house in its business in making advances on consignments, and had been so used at various times since, and that he is chargeable with interest since that date.

The legatee, Mrs. King, asks that the executor be charged with interest from May 12, 1868, to this day.

The item of $500, attorney's fees, is contested. That item is intended to cover fees for services on the demurrer of the executor to the petition of Mrs. King heretofore heard for re-opening the former settlement (which demurrer was sustained) on petition for distribution; for rendering and settling this account; and for retainer in the Supreme Court on an expected appeal from an order. The services on the demurrer and petition were of the value of $300. The rendering of the account was compelled upon petition of Mrs. King and order of Court, after various antagonistic proceedings were had. Upon the hearing of the account all the services rendered by the attorney have been in regard to matters in the interest of the executor as against the estate. The item of commissions will, of course, be changed to concur with the computation under these findings and the order thereon.

The executor also claimed that in no event can he be charged with interest prior to May 13, 1869, the day of the former settlement; that the settlement of that account was conclusive as to all transactions by the executor.

From the foregoing facts, the conclusions of law are as follows:

First—As to the settlement of the account of May 2, 1869. The settlement of that account was conclusive as to all matters therein contained; but it is not conclusive as to any other matters. In rendering an account an executor challenges attention to such matters only as he places in his account. He has the right, nay, it is his duty, to make a full report of all his transactions. If he fail to do so, he cannot claim any advantage as to the matters omitted. If an executor can (as recently held by the Supreme Court) omit credits and have them subsequently considered, how much more should he be held to account for omissions on the other side. The executor did not report any interest due or received; he did not challenge attention to the question whether or not he had used the funds. In such a case as this, interest is not an incident to the debt, in the ordinary commercial sense, to be considered as settled with the

principal; the law forbids an executor to use funds, and the legatee was not bound to presume or to suppose that he did use them.   The decree of the Court was, in terms, settling the account *as it was rendered and presented for settlement*, which, of course, embraces nothing not contained therein. Therefore, the question of interest or use was not passed upon by the settlement of that account, and can be inquired into by surcharging this account.

Second—As to interest.   The executor having mingled the funds of the estate with the funds of the house of which he was a member, and having used the same in the business of that house, is chargeable with interest from the dates of receiving the funds to this day, having credit, of course, for the amounts paid for the estate.   An executor or an administrator is expected and required to preserve the property of the deceased separate and apart from his own, and by itself to give it, as is said, an ear-mark, that it may always be known and readily traced to any one into whose hands it may happen to fall.   As was said in another case, "It was improper and unlawful for the accountant to mix the funds of the estate to any extent with his own.   However clear it may be that it was without any dishonest intention of making gain to himself, such a practice ought never to come before a Court without being in some way marked with its disapprobation."   I am aware that many persons honestly believe that if they have funds in hand as executors or administrators, and have given bonds, they are justified in mingling the funds with their own and in using the same, especially if the bonds are ample, and their business and social position are unquestioned, and they are at all times ready to respond.   Such belief is not founded upon any rule of law.   To the practice of using trust funds is to be attributed in great measure some of the sad wrecks of life and character which we read of in our public journals.   Heirs are not bound to wait until the catastrophe of an unfortunate adventure before they can question the right to have the money put to use; it is their due to have their money always ready, separate from other moneys.   The Legislature

has made no distinction between persons, in this regard. It holds to the same strictness of account the clerk or secretary who *believes* he can make good the balance, the errand boy who *hopes* he can replace his employer's securities, and the merchant who *knows* that his adventures are safe on ships in the harbor.

The interest should be computed at the rate of seven per cent. per annum to April 4, 1870, and thereafter to the day of settling this account, viz: January 24, 1876, at the rate of ten per cent. per annum, with annual rests as of May 12 of each year, compounding interest yearly as of that day.

Third—As to the item, $500, attorney's fees; this item is allowed at $300; the balance is disallowed.

Fourth—The commissions will be computed and allowed upon the entire estate accounted for by the executor, and upon the interest stated herein, deducting the commissions included in the former account.

The following is a statement of the account as settled herein, viz:

Charge to the executor the amounts to his debit
    in his account,- - - - - - $13,246.18
Interest to Jan. 24, 1876, - - - - - 9,883.60
<br>

    Total debits, - - - - - $23,129 78
Credit the executor with the first six items to his
    credit in his account, - - - - $1,500.00
Commissions due, - - - - - - 553.65
Attorney's fees, - - - - - - 300.00
<br>

    Total credits, - - - - - $2,353.65

Showing a balance due from the executor to the estate of $20,776.13.

And the account is thus settled.

On appeal to the Supreme Court, the judgment of the Probate Court was reversed as to the conclusiveness of the former settlement and affirmed in all other respects.

## April 30, 1878.

Upon the hearing of the petition of Anna King for distribution, the executor presented for settlement and allowance a statement in writing, which is filed.

Of the items contained in said statement the following are allowed:

| | |
|---|---:|
| Reporters' fees in Probate Court, - - - | $20 00 |
| Probate Court fees, - - - - - | 16 00 |
| May 19, 1876, G. B. Merrill, for demurrer to petition for distribution, - - - - - | 100 00 |
| Supreme Court costs, - - - - - | 15 00 |
| | $151 00 |

The item $15, Supreme Court fees, is allowed on the authority of the remittitur.

All the other items contained in said statement are disallowed (except say $50 for estimated expenses in closing the estate) for the following reasons:

The item dated May 19, 1876, paid G. B. Merrill for demurrer to petition of Anna King to surcharge account, $100, has been heretofore passed upon and settled by the opinion of this Court filed January 24, 1876.

The item of $750 estimated expenses on closing estate, was inserted to cover expenses of a possible appeal from the order of distribution now being asked for. The item $150, paid by G. B. Merrill April 2, 1878, demurrer to petition for distribution, is for services rendered in resisting this distribution now under consideration. J. C. Merrill as trustee, cannot have his attorneys' fees in this Court. He is in his capacity as trustee the same as any legatee, who must bear his own burdens.

All the other items arose in and about an appeal which J. C. Merrill took from the order of this Court settling his accounts.

This Court had charged him with interest to the amount of $9,883.60, for using the moneys of the estate. On the appeal the order of this Court was sustained as to all except $1,211.57 of the interest, which was for his using the moneys

12

prior to the settling of a former account, and which, the Supreme Court held, was barred by the settlement of that former account. The entire amount which the executor now asks may be allowed to him on that appeal is $988, including $250 for hearing the account and preparing the appeal, and $500 for arguing the case in the Supreme Court.

An executor is entitled to the services and advice of an attorney, at the expense of the estate, as to the proper management of the estate; but he is not entitled to have pay out of the estate for an attorney to advise him that he may apply the moneys of the estate to his own use; nor upon his appeal to the Supreme Court upon that question. The whole controversy upon the appeal was his own individual controversy, adverse to the interests of the estate, and in that controversy it was J. C. Merrill who was the litigant, not J. C. Merrill, executor. Of the $9,883.60, which this Court had charged him for using the money of the estate, the Supreme Court affirmed $8,672.03; holding that this Court had erred as to $1,211.57; not because he had not used the money, but because this Court could not go behind a former settlement and charge him for using prior to the date of the former account.